BCB ANESTHESIA CARE, LTD.; Beverly Werries, CRNA; Curtis M. Cravens, CRNA; and Robert Otken, CRNA, Plaintiffs–Appellants,

v.

The PASSAVANT MEMORIAL AREA HOSPITAL ASSOCIATION, a corporation, Peter Roodhouse, M.D., Clarence Lay, and Eric Giebelhausen, M.D., Defendants–Appellees.

No. 93–3166.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided Sept. 27, 1994.

Grady E. Holley (argued), Steven J. Rosen, Springfield, IL, for plaintiffs-appellants.

John S. Sandberg, Kathleen L. Pine (argued), Carolyn L. Trokey, Sandberg, Phoenix & Von Gontard, St. Louis, MO, for Passavant Memorial Area Hosp. Ass'n, Clarence Lay.

John E. Childress, Paul Bown (argued), Brown, Hay & Stephens, Springfield, IL, for Peter Roodhouse, MD.

R. Mark Mifflin (argued), Giffin, Winning, Cohen & Bodewes, Springfield, IL, for Eric Giebelhausen, MD.

Before BAUER and CUDAHY, Circuit Judges, and MORAN, District Judge.[1]

MORAN, District Judge.

Plaintiffs filed this complaint charging the defendants with violations of section 1 of the Sherman Act, 15 U.S.C. § 1. They alleged various pendent state claims as well. They complain that their practice as nurse anesthetists at a central Illinois hospital has been unlawfully restricted. Defendants moved to dismiss on a variety of grounds and the district court did dismiss, concluding that plaintiffs had not alleged a sufficient nexus with interstate commerce to invoke Sherman Act jurisdiction. An attempted amendment failed for the same reason and this appeal

1. The Honorable James B. Moran, Chief Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

followed. We now affirm, but on different grounds.

According to the complaint, the three individual plaintiffs are certified registered nurse anesthetists (CRNAs) and the corporate plaintiff, BCB Anesthesia Care Ltd. (BCB), is a business equally owned by the three of them. CRNAs compete with physician anesthesiologists (MDAs) and provide anesthesia services at lower cost. The defendants are The Passavant Memorial Area Hospital Association (Passavant)—the only acute care general hospital in Jacksonville, Illinois; MDA Peter Roodhouse; Clarence Lay, the hospital's chief executive officer; and Dr. Eric Giebelhausen, a Jacksonville doctor with staff privileges at Passavant.

According to the complaint the individual plaintiffs were employed as anesthetists at the hospital prior to July 28, 1991. During the first half of that year they negotiated an agreement with Passavant, effective July 29, 1991, whereby BCB provided anesthesia services to hospital patients, and billed them directly at $35 per unit. The hospital billed separately at $11 per unit, which plaintiffs claim was a violation of the BCB contract. When the CRNAs were employees the hospital had billed at $17 per unit for a portion of such services. During that time Dr. Roodhouse also provided anesthesia services as an independent contractor, with the billing done separately at $28 per unit.

During the last five months of 1991, BCB and the hospital anesthetists (apparently there were other anesthetists on staff) performed all but three anesthesia procedures at Passavant. Dr. Roodhouse, however, plaintiffs allege, billed patients and third party payers for anesthesia services he had not performed, in an effort to injure BCB. This practice caused those billed to complain about double billing and, in some instances, to fail to pay legitimate BCB bills. Dr. Roodhouse also derided BCB's billing practices to local physicians, leading some to conclude that BCB billings were either too high or unethical. Dr. Giebelhausen had been opposed to the BCB contract even before its inception, and subsequently urged its cancellation on the ground that BCB's billings were unethical and supported the restoration of Dr. Roodhouse as the primary anesthesiologist.

Beginning in April 1992, Dr. Roodhouse scheduled anesthesia services so as to perform the majority of those services during that month. Then, on May 20, 1992, Clarence Lay, the hospital CEO, advised plaintiffs that Passavant was terminating the BCB contract. The hospital subsequently entered into a contract with Dr. Roodhouse and raised its separate charges to $17 per unit. The individual plaintiffs were given the option of returning to employee status, even though the supervision of an MDA was not required either by law or codes of professional responsibility. Dr. Roodhouse, plaintiffs charge, acted to destroy BCB's business and to maintain or increase his earnings. All this, they allege, was a conspiracy in restraint of trade to limit their practice, to initiate a tying agreement between Passavant and Dr. Roodhouse, to boycott the plaintiffs, and to fix prices illegally. Further, Dr. Roodhouse's billings for services not performed violated Medicaid provisions and constituted mail fraud.

The concept of interstate commerce under the Sherman Act has had a troubled history, most recently illustrated in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). It has been marked by a disagreement over whether we should look to the concept of interstate commerce itself and the reach of congressional power, an expanding notion, *id.* at 327–29, 114 S.Ct. at 1846, or to the statutory prohibition against conspiracies that restrain interstate trade. *Id.* at 333–34, 114 S.Ct. at 1849. In *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the attention turned from whether or not the restraint, if successful, would have a substantial effect on interstate commerce, to whether or not activities allegedly infected by the restraint had a not insubstantial effect on interstate commerce.

Following *McLain,* courts divided on the question of whether to look to the business of the enterprise or a portion of it, or to the likely impact of the proscribed conduct if successful. *Summit Health,* 500 U.S. at 335–36, 111 S.Ct. at 1850 (dissent). This circuit

subscribed to the latter view in *Seglin v. Esau,* 769 F.2d 1274, 1280 (7th Cir.1985). The difference in views was not predicated upon limitations of congressional power, however, nor could they be so predicated in light of present day concepts of that power. *See e.g., United States v. Stillwell,* 900 F.2d 1104 (7th Cir.1990). Indeed, in *Summit Health,* the Court noted but did not rely upon notions of congressional power under the Commerce Clause.

■ We are left then with some uncertainty as to whether interstate commerce under the Sherman Act raises jurisdictional or substantive concerns, an uncertainty noted in *Seglin v. Esau,* 769 F.2d at 1278. We are persuaded, however, that the allegations here, however reviewed, are sufficient to withstand a motion to dismiss based on the contention that plaintiffs fail to allege a sufficient nexus to interstate commerce.

Plaintiffs first alleged that Passavant derives substantial revenue from interstate insurance and federal Medicare and Medicaid payments, and that it purchased substantial quantities of supplies coming from other states. They further alleged that they provided services to patients and third party payers at lower cost than the charges of MDAs, with a change to MDA services resulting in higher costs for federal and third party payers. When the complaint was dismissed they sought to amend, but the district court concluded that the amendments still did not provide a sufficient nexus to interstate commerce. Those amendments alleged that Passavant and the plaintiffs treated out-of-state patients and that BCB billings were through a Minnesota agency. Thus, plaintiffs contended, the treatment of out-of-state patients was affected and the Minnesota agent was deprived of his billing revenues.

We consider the complaint as plaintiffs sought to amend it, and we conclude that they have alleged a not insubstantial effect on interstate commerce. As in *Summit Health,* plaintiffs have alleged that both they and the hospital serve nonresident patients and receive reimbursement through Medi-

care (as well as Medicaid and insurance) payments. *Id.* at 327–29, 114 S.Ct. at 1846. Services are regularly performed for out-of-state patients and they generate revenues from out-of-state sources. *Id.* at 329–30, 114 S.Ct. at 1847. The costs to those patients and those revenue sources are allegedly increased. The Minnesota agent is also deprived of its revenues. There is therefore an alleged substantial impact on interstate commerce. And that, we think, is enough for jurisdiction under *Summit Health.*

■ But that does not end the inquiry. Defendants contended below, and continue to argue, that plaintiffs do not state a claim under section 1 of the Sherman Act, and with that we do agree. The Sherman Act is perhaps the quintessential delegation by the Congress to the courts of the task of fashioning a legal structure to govern conduct. From that delegation a number of judicially created principles have emerged. Only unreasonable restraints of trade are illegal. Some restraints, such as horizontal price-fixing, are so obviously anticompetitive that they are deemed, *per se,* illegal, without further elaboration. The anticompetitive effects of some conduct are problematic; we do not know whether or not the conduct is procompetitive or anticompetitive without a thorough exploration of its purpose and consequences in a competitive environment. We consider impact: does it potentially have a not insubstantial effect upon interstate commerce; and the nature of that impact: does it have an anticompetitive effect.

To be sure, an unlawful purpose and an anticompetitive effect are not alone sufficient. Two youngsters, not partners, who agree on prices for lemonade at stands on adjacent corners so as to eliminate price competition, have an unlawful purpose and their agreement is anticompetitive. That agreement does not, as a matter of practical economics, affect interstate commerce. We cannot say that those circumstances are comparable to those alleged here, but we can say, in view of *Summit Health,* that the interstate commerce threshold is relatively low.[2]

---

**2.** *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774 (7th Cir.1994), issued just prior to the release of this opinion, reaches essentially the

But what if the conduct has a not insubstantial effect upon interstate commerce—but we do not know if it is pernicious without a thorough exploration of purpose and effect? Then we turn to the rule of reason; we seek an answer to that question of purpose and effect before we decide whether or not that conduct runs afoul of the Sherman Act, and that raises questions of market definition and market power. Indeed, pinning a label on conduct, such as "tying" or "boycott," is not enough if the conduct does not necessarily have the pernicious effect the label suggests. *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

This case involves one hospital's decisions about staff privileges and staffing patterns. The cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present. Those cases invariably analyze those circumstances under the rule of reason—there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all. *Bhan v. NME Hospitals,* 929 F.2d 1404, 1412 (9th Cir.1991). A hospital has an unquestioned right to exercise some control over the identity and number to whom it accords staff privileges. *Jefferson Parish Hospital,* 466 U.S. at 30, 104 S.Ct. at 1567–68. Malpractice concerns, quality of care, market perceptions, cost, and administrative considerations may all impact those decisions.

Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act. *See e.g., Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir.1994) (anesthesiologist challenging exclusive contract); *Flegel v. Christian Hosp., N.E.–N.W.,* 4 F.3d 682 (8th Cir.1993) (osteopaths denied privileges because they lacked certification from a particular organization); *Capital Imaging v. Mohawk Valley Med. Assoc.,* 996 F.2d 537 (2d Cir.1993) (radiologists challenging exclusive contract); *Lie v. St. Joseph Hosp.,* 964 F.2d 567 (6th Cir.1992) (physician's surgical privileges were suspended); *Tarabishi v. McAlester Regional Hosp.,* 951 F.2d 1558 (10th Cir.1991) (physician opened up a treatment center and hospital greatly reduced his privileges); *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696 (4th Cir.1991) (physician suspended, put on probation and then terminated); *Bhan v. NME Hospitals,* 929 F.2d 1404 (9th Cir.1991) (anesthetist was excluded by policy of allowing only physicians to perform anesthesia services); *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991) (physician denied radiology privileges); *Morgan, Strand v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991) (radiologists challenging exclusive contract); *Nurse Midwifery v. Hibbett,* 918 F.2d 605 (6th Cir.1990) (midwives and obstetrician allege they were prevented from operating a maternity practice or offering midwifery services at hospitals); *Beard v. Parkview Hosp.,* 912 F.2d 138 (6th Cir.1990) (radiologist challenging exclusive contract); *Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119 (7th Cir.1986) (anesthesiologist's privileges terminated); *Goss v. Memorial Hosp. System,* 789 F.2d 353 (5th Cir.1986) (physician's privileges terminated); *Konik v. Champlain Valley Physicians Hosp.,* 733 F.2d 1007 (2d Cir.1984) (anesthesiologist challenging contract); *Dos Santos v. Columbus–Cuneo–Cabrini Med. Ctr.,* 684 F.2d 1346 (7th Cir.1982) (vacating preliminary injunction which was decided in favor of anesthesiologist challenging exclusive contract); *Cogan v. Harford Memorial Hosp.,* 843 F.Supp. 1013 (D.Md.1994) (hospital's policy excluded unaccredited radiology center); *Willman v. Heartland Hosp. East,* 836 F.Supp. 1522 (W.D.Mo.1993) (physician excluded after peer review); *Scara v. Bradley Memorial Hosp.,* 1993 WL 404150 (E.D.Tenn.) (anesthesiologist challenging exclusive contract); *Miller v. Indiana Hosp.,* 814 F.Supp. 1254 (W.D.Pa. 1992) (physician's privileges terminated); *Jackson v. Radcliffe,* 795 F.Supp. 197 (S.D.Tex.1992) (hospital terminated radiologist's contract); *Pudlo v. Adamski,* 789 F.Supp. 247 (N.D.Ill.1992) (same); *Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989 (N.D.Ga.1992) (same); *Purgess v. Sharrock,*

same conclusion. That conclusion would, in any event, be binding here.

1992 WL 349683 (S.D.N.Y.) (anesthesiologist's privileges terminated); *Brown v. Our Lady of Lourdes Med. Ctr.*, 767 F.Supp. 618 (D.N.J.1991) (surgeon denied privileges); *Anesthesia Advantage v. Metz Group*, 759 F.Supp. 638 (D.Colo.1991) (hospital terminated negotiations with anesthetists); *Bellam v. Clayton County Hosp. Authority*, 758 F.Supp. 1488 (N.D.Ga.1990) (preliminary injunction denied to anesthesiologists challenging exclusive contract); *Boczar v. Manatee Hospitals & Health Systems*, 731 F.Supp. 1042 (M.D.Fla.1990) (obstetrician's privileges suspended); *Castelli v. Meadville Med. Ctr.*, 702 F.Supp. 1201 (W.D.Pa.1988) (radiologist challenging exclusive contract). *But see Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir.1991) (cardiologist whose staff privileges were terminated stated antitrust claim); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810 (11th Cir.1990) (directed verdict was premature against physician whose privileges were terminated); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988) (anesthetist's contract terminated).

The reasons advanced for that conclusion are varied. Insufficient nexus to interstate commerce, lack of standing, lack of antitrust injury, failure to show a detrimental effect on competition, the inability of a hospital to conspire with its staff, and insufficient market power in the relevant market are among the reasons relied upon for denying section 1 relief. Sometimes the conclusion follows a motion to dismiss; more often the decision is one of summary judgment, but often it appears that the record relied upon is the absence of facts indicating special circumstances raising antitrust concerns.

While there is "reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital," *Dos Santos*, 684 F.2d at 1353, there may be, for example, anticompetitive impacts in a wider market. *Summit Health* ostensibly dealt with the interstate commerce issue, but implicit in that decision was the conclusion that a sham peer review could affect a regional or even a national market and be violative of the Sherman Act. *Balaklaw*, 14 F.3d at 795 n. 2. One health provider may possibly deny a patient reasonable access to any health care. *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555 (7th Cir.1991). Still, we are mindful that the only case of which we are aware in which the plaintiff has prevailed is *Oltz*, 861 F.2d 1440, where the court was apparently persuaded by the determination that the relevant market, while not one hospital, was only two hospitals.[3]

The complaint in this case alleges that Passavant is the only acute care general hospital in Jacksonville, but Jacksonville is only twenty-five miles or so from Springfield, the state capital. Nothing in the complaint suggests that patients are foreclosed from going elsewhere in the unlikely event that they are involved in pricing decisions. Indeed, they can select the CRNA plaintiffs as their anesthetists at Passavant in the unlikely event that they wish to be personally involved in that selection. Third party payers can set their own price limits if they choose, or encourage surgery elsewhere by preferred provider arrangements or the like. The plaintiffs can practice at Passavant or elsewhere—they are not disabled from practicing wherever they choose. The hospital can continue with its present arrangement or choose another, including a return to the arrangement with plaintiffs. The only restraints alleged are that plaintiffs cannot now practice in the business form they prefer and the prices the hospital charges may be somewhat higher now than they were. Plaintiffs also allege that they were injured by a dispute about double billing because of public and hospital perceptions about who was in the right, even though they were in the right. Even so (and we accept the allegations as

---

**3.** We do not think it significant, as the dissent suggests, that plaintiffs have usually lost at the summary judgment stage rather than by dismissal. What is significant is that they have lost as a matter of law because of an apparently uniform conclusion that, without something more, a staffing pattern dispute at one hospital does not cause an unreasonable restraint of trade within the ambit of the antitrust laws. Once the plaintiff had survived the jurisdictional challenge in *Hammes* there could be no doubt that the unreasonable restraint alleged was within that ambit: a conspiracy among a number of competitors in the Indianapolis market to allocate automobile transmission customers.

true), we fail to see how that dispute adds to the strength of plaintiffs' antitrust claim.

A staffing decision does not itself constitute an antitrust injury. "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 708 (4th Cir.1991). Here we are given little reason to infer that there is an impact on competition within the relevant market defined by plaintiffs, and no reason to infer such an impact within the broader relevant market that we undoubtedly must consider.

The *per se* approach to antitrust law was a judicial creation—a belief that some conduct was so invariably anti-competitive that it did not justify a detailed examination of purpose and effect. We think the judicial concern with avoiding burdensome litigation unless there is an apparent justification for it applies with equal force here. How one hospital staffs its needs is so unlikely to be within the ambit of section 1 of the Sherman Act that it does not justify a detailed examination of purpose and effect unless plaintiffs give us far better reasons for that examination than they have here. "Although we hesitate to say that [a staffing decision at one hospital] ... can never state an antitrust claim, we believe it is incumbent upon the plaintiff to plead some additional facts from which it can be inferred that the case falls within the ambit of the Sherman Act." *Seglin v. Esau, supra.* Before we enlist this court in the micromanagement of the staffing arrangements at Passavant under the aegis of the antitrust laws, we need better reasons than the plaintiffs have given us.

The judgment is affirmed.

CUDAHY, *Circuit Judge*, concurring in part and dissenting in part.

I agree that, particularly after *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), and *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir.1994), the present complaint is sufficient to withstand challenge on jurisdictional grounds since there is a sufficient nexus to interstate commerce.

I have greater difficulty, however, in concluding that the complaint fails to state a claim upon which relief can be granted. As the majority points out, in the vast majority of cases involving "staffing decision[s] at a single hospital," where violations of Section 1 of the Sherman Act have been alleged, plaintiffs have failed to show that the restraint on trade was unreasonable. The pleadings here do indeed involve staffing decisions in a single hospital, but those decisions allegedly concern the competitive relations of nurse anesthetists and physician anesthetists. The circumstances alleged seem to me adequate to invoke Section 1 of the Sherman Act. To the extent that *Seglin v. Esau*, 769 F.2d 1274, 1280 (7th Cir.1985), might suggest otherwise, I believe the authority of that case has been severely undermined by *Summit Health* and *AAMCO Transmissions*.

It may well be that the allegations here cannot withstand any analysis under the Rule of Reason, *see, e.g., Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1352 (7th Cir.1982), but that question—which requires calculations of the degree of restraint and of the relevant market—does not lend itself to a decision on the pleadings alone. *Id.* Certainly the majority of the Section 1 decisions that have ultimately rejected the plaintiff's claims have not been made on the pleadings (in fact, of the cases cited by the majority, all but two, *Pudlo v. Adamski*, 789 F.Supp. 247 (N.D.Ill. 1992); *Boczar v. Manatee Hospitals & Health Systems*, 731 F.Supp. 1042 (M.D.Fla. 1991), were decided on summary judgment or after trial).

I would reverse, and therefore dissent on the ground indicated.