Jonathan D. **KORSHIN**, M.D., **Plaintiff,**

v.

**BENEDICTINE HOSPITAL,** Kingston Hospital, Northern Dutchess Hospital, Cross River Healthcare, Inc., and Cross River Anesthesiologists, P.C., Defendants.

No. 98–CV–0677.

United States District Court, N.D. New York.

Feb. 2, 1999.

Woods, Oviatt Law Firm, Rochester, NY (Daneil O'Brien, Jr., of counsel), Friedman, Hirschen Law Firm, Schenectady, NY (Jeffrey Miller, of counsel), for Plaintiff.

O'Connor, Yoquinto Law Firm, Troy, NY (Thomas J. O'Connor, of counsel), for Defendants Kingston Hosp., Northern Dutchess Hosp. and Cross River Healthcare, Inc.

Van DeWater, Van DeWater Law Firm, Poughkeepsie, NY (Michael G. Hayes, of counsel), for Defendant Benedictine Hosp.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

This is an antitrust case brought by an anesthesiologist against various hospitals and a group of anesthesiologists. Plaintiff Jonathan Korshin, M.D. ("Korshin") claims violations of section 1 of the Sherman Act, 15 U.S.C. § 1 and section 4 of the Clayton Act, 15 U.S.C. § 15.[1] Korshin alleges that Benedictine Hospital ("Benedictine"), Kingston Hospital, and Northern Dutchess Hospital ("Northen Dutchess") (collectively the "Hospitals"), in anticipation of a merger, entered into exclusive agreements with Defendant Cross River Anesthesiologists, P.C. ("CRA") of which he was not a member and, therefore, he is unable to practice medicine in the regional market. Korshin alleges that the exclusive agreements with CRA constitute a group boycott and unreasonable restraint of trade that prevents him from rendering anesthesiology services in the relevant market area. The defendants now move to dismiss the Complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that: (1) Korshin has failed to adequately allege antitrust injury, and (2) Korshin violated the doctrine of primary jurisdiction.

---

1. Korshin also asserts a pendent state law claim.

## I. BACKGROUND

The following facts are taken from the Complaint which, for purposes of a motion pursuant to Rule 12(b)(6), must be accepted as true. *See Bernheim v. Litt,* 79 F.3d 318, 321 (1996).

Effective January 1, 1995, Korshin was appointed as a member of the courtesy medical staff in the Department of Anesthesia at Benedictine (the "Department"). Korshin was reappointed as a member of the active medical staff with privileges for anesthesiology and pain management as of April 1, 1996.

On August 16, 1996, the Benedictine Board of Directors (the "Board") adopted an exclusivity policy (the "Policy") which provided that all anesthesiology services be provided by anesthesiologists and certified registered nurse anesthetists ("CRNA") employed or engaged by Benedictine. The Policy contained a "grandfather clause" that permitted physicians, such as Korshin, who had staff privileges at Benedictine prior to the adoption of the Policy to provide services on elective cases when a specific request for that anesthesiologist was made by the surgeon performing the procedure.

Sometime in 1996 or early 1997, the date of which is unclear, the Hospitals entered into merger negotiations. In June 1997, prior to merger, the Hospitals agreed that they would all obtain anesthesiology services exclusively from CRA, which was already providing services at Northern Dutchess.[2] In accordance with this agreement, by June 5, 1997, Benedictine selected CRA as the exclusive provider of anesthesiology services, effective September 1, 1997. CRA was instructed to meet with each member of the Department, including Korshin, to discuss potential employment opportunities with CRA. Korshin alleges that he sought to become an employee of CRA, "but was unable to do so." Compl., ¶ 34. Benedictine notified Korshin that it was terminating any and all contract and agreements, written or oral, effective September 1, 1997.

By memorandum dated June 17, 1997 the Board advised all physicians in the Department that the Policy was under review and that the Board was considering amending or deleting the grandfather clause. A meeting was scheduled for June 19, 1997 to discuss the proposed changes to the Policy.

In September 1997, the Board adopted a resolution that eliminated the grandfather clause to the Policy and selected CRA as the exclusive provider of anesthesiology services effective October 1, 1997. The resolution further provided that any anesthesiologist and CRNA currently on the medical staff and not part of the exclusive group would retain membership on the medical staff and clinical privileges, but would no longer be able to exercise clinical privileges within the Department.

As indicated in the Board's resolution (a copy of which is annexed to the Complaint at Exhibit "D"), Benedictine's decision to remove the grandfather clause and award an exclusive contract to CRA was based upon concerns that the grandfather clause impeded the institutional objectives of the hospital. The Board had concerns about quality of care in the Department and, thus, retained an outside expert to perform an analysis of the structure of the Department.[3] In accor-

---

2. The merger was never effectuated.

3. The consultant was from the Hospital Association of New York State and recommended that the anesthesiology department be closed, that Benedictine have one entity render all anesthesia care, and that the grandfather clause be eliminated. The consultant's rationale is as follows:

[One of the reasons for my recommendation] to close the anesthesiology department and have one entity render all the anesthesia care ... and to rescind the grandfathering provision ... was economics in the sense that there's a large disparity in reimbursement for anesthesia services among the different payers; in other words, Medicaid is nonexistent reim-

bursement. Medicare is wholly inadequate. And there's a small percentage of the managed care fees which are highly discounted as they are. And as a result, you can have a department where you can have some highly skilled physicians taking care of some very elderly and sick patients ... These people can be getting very low reimbursement for the services and the other physicians taking care of routine cases, which have good reimbursement. Therefore, it becomes this economic disparity among the physicians that are practicing here [that] can lead to strife, it is somewhat unfair and it penalizes a fine physician that is taking care of a very sick patient that provides very low reimbursement.

dance with the conclusions of the consultant and the concerns raised within the Department, the Board provided the following reasons for its decision to remove the grandfather exception and enter into an exclusive agreement for the provision of anesthesiology services:

1. A non-exclusive practice situation leads to competition among anesthesiology providers for patients with widely differing potentials for reimbursement, leads to internal strife within the Department, is detrimental to practice and has the potential to adversely impact quality of care.

2. A single group arrangement eliminates the issue of economics among the individual Anesthesiologists because all losses and gains of the group are shared. Thus, a single group arrangement facilitates assignment of Anesthesiologists to particular cases based on the best interests of the patient without regard to economic concerns.

3. A single group arrangement will promote consistency of service, day to day operation of the operating suite, quality control and safety of patients; promote effective selection and utilization of equipment within the Department; facilitate continuous availability of anesthesiology services; more clearly assign responsibility for the administration, supervision and training of Department personnel; and promote efficient and economical operation of the Department and cooperation among members of the Department and Medical Staff Members who use the operating suite.

[T]he only way to solve this problem within an institution, and ... it's a very common solution, is to pool all the resources and the group shares in all the risks and rewards and this issue for one physician is nonexistent anymore. The group ... assumes the risk [of] low reimbursement and they also share in the good reimbursement, but for the individual physician the insurance reimbursement has no impact on his approach to the patient ... [If you] pool all these resources ... you can assign ... people with specific skills to take care of specific patients.

4. According to the Complaint, the New York State Department of Health requires that obstet-

4. Creating a unified structure will facilitate development of diverse practice skills among the Anesthesiologists, thereby increasing the group's capacity to develop programs of quality to focus on special areas of importance and to be flexible and responsive to the needs of patients and their families.

5. The unified structure will also provide centralized control and simplified scheduling of the anesthesia facilities; and improve the coordination of the use of anesthesia services with other services of the Hospital.

On April 28, 1998, Korshin commenced the instant litigation pursuant to the Sherman Act, 15 U.S.C. § 1, and for treble damages and attorneys' fees under section 4 of the Clayton Act, 15 U.S.C. § 15. Korshin also asserts a state law cause of action. The Complaint alleges that Benedictine's actions were the latest in a series of efforts to reduce competition and alleges that "[a]s a direct result of [the Hospitals'] exclusive dealings agreement and the elimination of the exception to the [ ] Policy at [ ] Benedictine ... Korshin is unable to practice his specialty of anesthesiology at any location which is within the distance from his residence which would meet his professional obligations to his patients and which would satisfy a hospital's legal obligations to its patients." [4] Compl., ¶ 35. The Complaint further alleges that, as a result of defendants' conduct, "patients and their physicians at the defendant Hospitals are unable to select Dr. Korshin to provide anesthesiology services in competition with defendant [CRA]." Compl., ¶ 36.

rical service be no more than thirty minutes from patients in the catchment area for that service. The Complaint further alleges that patients should be entitled to receive emergency treatment within one-half hour. Similarly, the Complaint asserts that regulations at 10 N.Y.C.R.R. § 708.5 require that if an anesthesiologist is not in a hospital that has a trauma center designation, an anesthesiologist must be on call and available within twenty minutes. According to Korshin, the closest hospitals other than the Defendant Hospitals are at least 31 miles away and can take up to an hour of travel time from his home.

Finally, as part of his state law cause of action, Korshin alleges that he was induced to move from out of state by Benedictine's promise to compensate him at an annual rate of $240,000.00 as director of the anesthesiology department. Korshin alleges that, thereafter, Benedictine engaged in a "deliberate pattern and practice of conduct which resulted in reduced earning to Dr. Korshin and ultimately eliminated his ability to practice anesthesiology anywhere in the Kingston–Northern Dutchess area, to his great economic damages, all contrary to the assurances and representation which [Benedictine] had made to Dr. Korshin and on which he detrimentally relied." Compl., ¶ 43.

The defendants now move pursuant to FED.R.CIV.P. 12(b)(6) for dismissal of the Complaint in its entirety on the grounds that Korshin lacks standing to assert an antitrust action and that Korshin violated the doctrine of primary jurisdiction.

## II. DISCUSSION

### A. Standard Under Rule 12(b)(6)

"A complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. The review of such a motion is limited, and the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims ..." *Bernheim v. Litt,* 79 F.3d 318, 321 (1996) (internal quotations and citations omitted). "In order to survive dismissal, a plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim." *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997). Because this is a motion pursuant to Rule 12(b)(6), the Court considers only the pleadings and any documents annexed thereto. With this standard in mind, the Court will now address defendants' motion to dismiss.

### B. Standing to Prosecute Private Antitrust Claims

"Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir.1991) (citing *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968)). "Thus, antitrust standing is not simply an inquiry for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Id.* Accordingly, whether a plaintiff has antitrust standing involves a two prong analysis: one, whether the plaintiff has suffered an antitrust injury; and two, whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws. *Balaklaw v. Lovell,* 14 F.3d 793, 798 n. 9 (2d Cir.1994).

### 1. Antitrust Injury

To establish antitrust injury, "plaintiff[ ] must show more than that the defendants' conduct caused [him] an injury. Plaintiff[ ] must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. This antitrust injury requirement underscores the fundamental tenet that the antitrust laws were enacted for the protection of *competition,* not *competitors."* *Balaklaw,* 14 F.3d at 797 (internal citations and quotations omitted) (emphasis in original). Thus, "[t]he antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Capital Imaging v. Mohawk Valley Med. Assoc.,* 996 F.2d 537,

543 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993)).

Korshin has clearly alleged injury to his own business interests. The fundamental flaw in the Complaint, however, is that it alleges no detrimental impact upon market-wide competition. The relevant portions of the Complaint state that Benedictine and Kingston Hospital each receive a large number of patients injured or taken ill on the New York State Thruway, Compl., ¶ 27; the closest other hospitals to the defendant Hospitals are at least 31 miles away "and can take close to an hour [to reach] in heavy travel periods", Compl. ¶ 28; obstetrical services provided at Benedictine should be no more than thirty minutes from the patients in the catchment area for that service, Compl. ¶ 29; emergency medical services ought to be provided within a "golden half-hour" or, at most, a "golden hour" so that patients receive timely medical attention, Compl. ¶ 30; inpatient hospital discharges from the Hospitals are concentrated in northern Ulster and Dutchess Counties, while discharges from the Hospitals of residents from Poughkeepsie and Hudson, where the nearest other hospitals are located, are extremely small, Compl., ¶ 31; anesthesiologists must be available within a reasonable travel time if called to the hospital, Compl., ¶ 32; pursuant to New York State regulations, if an anesthesiologist is not in a hospital that has a trauma center designation, then the anesthesiologist must be on call and available within twenty minutes, *id.;* that the Hospitals are the only hospitals within twenty minutes of Korshin's home, *id.;* that Korshin and Benedictine entered into an agreement containing a non-compete clause whereby Korshin was precluded from engaging in the practice of anesthesiology within a 15 mile radius of Benedictine, Compl. ¶ 33; that Korshin was unable to become an employee of CRA, Compl. ¶ 34; that "[a]s a direct result of defendants' exclusive dealing agreement and the elimination of the exception to the Exclusivity Policy at [ ] Benedictine … Korshin is unable to practice … anesthesiology at any location which is within the distance from his residence which would meet his professional obligations to his patients and which would satisfy a hospital's

legal obligations to its patients, Compl., ¶ 35; and that [a]s a direct result of defendant's [sic] exclusive dealing agreement and the elimination of the exception to the Exclusivity Policy at [ ] Benedictine [ ], patients and their physicians at the defendant Hospitals are unable to select Dr. Korshin to provide anesthesiology services in competition with defendant [CRA]. Compl., ¶ 36."

The Court assumes, for purposes of this motion, that the relevant market area includes only the defendant Hospitals. Viewing the facts in the light most favorable to Korshin, the Complaint, nonetheless, fails to allege any facts from which injury to market-wide competition can be inferred. *See e.g. S.O. Textiles Co., Inc. v. A & E Products Group,* 18 F.Supp.2d 232, 243 (E.D.N.Y. 1998). Rather, Korshin merely alleges injury to himself, which is insufficient to confer standing to assert antitrust violations. For example, Korshin has not alleged any change in the price of anesthesiology services, a decrease in quality or efficiency of care, or that the consumers of anesthesiology services, be they patients, referring physicians, or third-party payers, have less of a market choice, other than their ability to select Korshin, as a result of defendants' actions. *See e.g. Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984); *Ezekwo v. American Bd. Of Internal Medicine,* 18 F.Supp.2d 271, 278 (S.D.N.Y.1998); *Finkelstein, M.D. v. Aetna Health Plans of New York, Inc.,* 1997 WL 419211, at * 4–5 (S.D.N.Y.1997), *aff'd,* 152 F.3d 917 (2d Cir.1998). Similarly, although the Complaint alleges that Korshin was not able to join CRA, for whatever reason, there are no allegations that other anesthesiologists in the region could not join CPA. Thus, Korshin simply fails to allege an actual injury to competition separate from injury to himself. *See U.S. Airways Group, Inc. v. British Airways, PLC,* 989 F.Supp. 482, 487 (S.D.N.Y.1997). "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 245 (2d Cir.1997).

As happened in *Balaklaw,* 14 F.3d 793, Korshin's "claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contract . . . and nothing more." *Id.* at 798. Looking specifically at the relevant markets, it is clear that the Complaint fails to state a claim. "From the consumers' point of view, nothing about the market has changed . . . 'it is clear that what occurred after the implementation of the exclusive contract . . . was only a reshuffling of competitors.'" *Id.* (quoting *Coffey v. Health-trust, Inc.,* 955 F.2d 1388, 1393 (10th Cir. 1992)).[5] Thus, there was no change in the exclusivity policy, only the provider changed. *Balaklaw,* at 799.

With respect to providers of anesthesiology services, "the market remains similarly unaltered." *Id.* Again, there has simply been a reshuffling of competitors. "The relevant market here is the market in which anesthesiologists compete for jobs." *Id.* Aside from the allegations that Korshin himself is precluded from competing with CRA, the Complaint is devoid of allegations that market-wide competition has been hampered by virtue of the exclusive agreements. Furthermore, as previously noted, there are no allegations that anesthesiologists are precluded from joining CRA. In fact, the exhibits annexed to the Complaint demonstrate that Benedictine urged CRA to discuss employment opportunities with the members of its Department. Thus, there are no indications that Korshin and other anesthesiologists are excluded, or substantially limited, in the broader market for employment, and, accordingly, no antitrust injury is presented. *Id.*

Korshin asserts that the present matter is distinguishable from *Balaklaw* and its progeny because the three defendant Hospitals together agreed to utilize CRA exclusively or, in other words, that the present matter involves a group boycott. Pl. Memo. of Law, at 6–7. While under certain circumstances a group boycott constitutes a per se violation of

the antitrust laws, *Balaklaw,* 14 F.3d at 800, the existence of a violation of the Sherman Act is irrelevant for purposes of standing. *Id.* "Regardless of any substantive violation of the Sherman Act, . . . plaintiffs [are still required] to establish that the defendants engaged in anticompetitive conduct that caused them an antitrust injury." *Id.; see Levine v. Central Florida Medical Affiliates, Inc.,* 864 F.Supp. 1175 (M.D.Fla.1994), *aff'd,* 72 F.3d 1538 (11th Cir.1996), *cert. denied,* 519 U.S. 820, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996). As previously noted, Korshin has failed to demonstrate any such conduct or injury.

A similar situation was presented in *Angelico v. Lehigh Valley Hosp., Inc.,* 984 F.Supp. 308 (E.D.Pa.1997); *see also Levine,* 864 F.Supp. 1175. In *Angelico,* the plaintiff alleged that certain hospitals engaged in a group boycott that precluded him from securing privileges at any hospital within the relevant market area. As here, the plaintiff in *Angelico* claimed that he had standing a *fortiori* because a group boycott is a *per se* violation. The court rejected plaintiff's argument noting that "[t]he question of whether a plaintiff has standing to raise antitrust claims under *any* theory is a threshold issue . . . [and][w]hether there was or was not a *per se* violation . . . is irrelevant." *Id.* at 312 (citing *Balaklaw,* 14 F.3d at 800; *Baglio v. Baska,* 940 F.Supp. 819, 828 (W.D.Pa.1996), *aff'd,* 116 F.3d 467 (3d Cir.1997)). The court then found that although "it is clear that [p]laintiff was unable to obtain privileges at any of the hospitals in this market . . . an injury to [plaintiff] personally does not confer standing upon him without a showing that his absence from the relevant product and geographical markets injured competition and/or the consumers of [ ] surgical services in these markets. Stated otherwise, there must be evidence of a negative impact on prices, quantity or quality of [ ] surgical services in the [relevant] market to show

---

**5.** The pleadings, together with the documents annexed thereto, demonstrate that Benedictine previously operated under a *de facto* exclusivity policy "pursuant to which the physician anesthesiologists like Dr. Korshin and [CRNAs] employed or engaged by [ ] Benedictine Hospital were the exclusive providers of anesthesiology services at the hospital." Compl., ¶¶ 15–16. This *de facto* policy ultimately was formally adopted by Benedictine. In fact, part of Korshin's gripe is that the removal of the grandfather clause to the exclusivity policy precluded him from practicing at Benedictine.

antitrust injury and not just injury to one competitor." *Id.* (citing *Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 728 (3d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992)). As noted, Korshin's Complaint does not allege any such negative impact in prices, quantity or quality resulting from Korshin's absence as an available provider at the Hospitals.

Korshin next claims that the facts set forth in the Complaint demonstrate that there will be an adverse effect on the market and that consumer choice will be adversely affected. In support of this contention, Korshin cites to paragraph 31 of the Complaint wherein he states that 76.4% and 65% of the inpatient surgical and selected obstetrical discharges for Kingston residents and Rhinbeck and Rhinecliff residents respectively were from the Hospitals. Contrary to Korshin's contention, however, the Complaint does not allege a detrimental impact upon consumers, but only upon his personal interests. In fact, the Complaint specifically states that "[a]s a result of defendants' exclusive dealing agreement and the elimination to the exception to the Exclusivity Policy ... *Dr. Korshin is unable to practice his specialty* .... within [20 minutes] from his residence....", and that "[a]s a direct result of defendants' exclusive dealing agreement and the elimination of the exception to the Exclusivity Policy ... patients and their physicians ... are unable *to select Dr. Korshin* to provide anesthesiology services in competition with defendants [CRA]." Compl, ¶¶ 35–36 (emphasis supplied). There is no indication that consumers cannot go to a hospital that would provide them with the anesthesiologist of their choice, including Dr. Korshin. *See Jefferson Parish,* 104 S.Ct. at 1567. Furthermore, the Complaint itself reveals that at least one quarter of the relevant populations have, indeed, gone to other hospitals which are only 31 miles away.

In this regard, the case of *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n.,* 36 F.3d 664 (7th Cir.1994), is instructive. In *BCB,* plaintiff argued that he was precluded from practicing in the only

hospital in the Jacksonville, Illinois area. The court noted, however, that Springfield, which contained other hospitals, "is only twenty-five miles or so from [Jacksonville]... Nothing in the Complaint suggests that patients are foreclosed from going elsewhere in the unlikely event that they are involved in pricing decisions.... Third party payers can set their own price limits if they choose, or encourage surgery elsewhere by preferred provider arrangements or the like. [P]laintiff[ ] can practice ... elsewhere—[he is] not disabled from practicing wherever [he] choose[s]. The hospital can continue with its present arrangement or choose another, including a return to the arrangement with plaintiff[ ]." *Id.* at 668.

Similar circumstances are presented here. Korshin is not precluded from practicing at other hospitals which are, at most, only 31 miles away, patients are not foreclosed from going to hospitals at which Korshin could conceivably obtain privileges, and the Hospitals can each opt to discontinue their exclusive arrangements with CRA and even award an exclusive agreement to Korshin.

### 2. Efficient Enforcer

█ Assuming, *arguendo,* that Korshin did suffer an antitrust injury, he is not an efficient enforcer of the antitrust laws. Numerous courts have held that a physician is not the most appropriate person to enforce potential antitrust violations in circumstances similar to those presented here. Rather, consumers of anesthesiology services, including patients, referring physicians, and third-party payers, and the government would be more "efficient enforcers" of the antitrust laws because they have stronger interests in ensuring that prices, services, quantity and quality remain at competitive levels. *See e.g. Addis v. Holy Cross Health System Corp.,* 1995 WL 914278, at * 8 (N.D.Ind. Jul.6, 1995); *Rooney v. Medical Center Hosp. of Chillicothe,* 1994 WL 854372, *6 (S.D.Ohio); *Leak v. Grant Medical Center,* 893 F.Supp. 757 (S.D.Ohio 1995), *aff'd,* 103 F.3d 129 (6th Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 175 (1997).

A review of the factors identified in *Associated Gen. Contractors of California, Inc. v.*

*California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983), support the conclusion that Korshin is not an "efficient enforcer" of the antitrust laws. Any alleged harm claimed by Korshin is not of the type that Congress sought to redress with the antitrust laws. At most, plaintiff is precluded from exercising hospital privileges at only those hospitals that are within a twenty minute drive of his home. He is not foreclosed from practicing elsewhere in New York or other states. Further, the Complaint does not allege an improper motive on the part of defendants; that is, there are no allegations that defendants intended to control price or the quality or quantity of available anesthesia services. Rather, the Complaint merely alleges that defendants restrained competition and trade by entering into an exclusive dealing agreement for anesthesia services in the Kingston-northern Dutchess area to the damage of Plaintiff. The materials annexed to the Complaint, however, demonstrate that Benedictine had legitimate reasons relating to quality of care that prompted its decision to enter into an exclusive arrangement for the provision of anesthesiology services.

## III. CONCLUSION

For the foregoing reasons, Korshin does not have antitrust standing and, therefore, the First Cause of Action must be dismissed. Having dismissed the federal claim, there remains no independent basis for federal jurisdiction and, thus, the exercise of supplemental jurisdiction is not appropriate and the Second Cause of Action asserting state law claims must also be dismissed. *See* 28 U.S.C. § 1367(c)(3); *Buckley v. Consolidated Edison of New York, Inc.,* 155 F.3d 150, 157 (2d Cir.1998); *Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991), *cert. denied,* 502 U.S. 941, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991).

**IT IS SO ORDERED.**