[No. D057858. Fourth Dist., Div. One. Oct. 6, 2011.]

M. LOU MARSH, Plaintiff and Appellant, v.
ANESTHESIA SERVICES MEDICAL GROUP, INC., et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†This opinion is certified for publication with the exception of parts VI and VII.

COUNSEL

Rosenberg, Shpall & Associates, David Rosenberg and Amy Lea for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, Matthew J. Schenck and Timothy M. Keegan for Defendant and Respondent Anesthesia Services Medical Group, Inc.

Arent Fox, Steven E. Bledsoe, Roy Z. Silva and Steven A. Haskins for Defendants and Respondents Scripps Memorial Hospital La Jolla, Scripps Ximed Surgery Center and Scripps Health.

## OPINION

**HUFFMAN, Acting P. J.**—Plaintiff and appellant M. Lou Marsh (Appellant) is a board certified anesthesiologist licensed to practice medicine in California. She filed this action for damages and other relief against her former practice group, defendant and respondent Anesthesia Service Medical Group, Inc. (ASMG), a professional medical corporation that provides physician services to hospitals and other medical centers in San Diego County. She also sued one of the facilities served by ASMG, Scripps Memorial Hospital La Jolla (Scripps), after she experienced interpersonal and professional difficulties in carrying on her medical practice at a Scripps facility, the Scripps XiMED Surgery Center (Ximed).

In several successive pleadings that were challenged by a series of demurrers by ASMG and Scripps (together, Respondents), Appellant pled several types of unlawful or unfair business practices and related tort theories, which allegedly caused her unfair exclusion from practice. She contends Respondents' acts were in violation of the Cartwright Act (Bus. & Prof. Code,[1] § 16700 et seq.), and/or the unfair competition law (the UCL; § 17200 et seq.). She also alleged that Respondents injured her by intentionally and/or negligently interfering with her prospective business advantage, and intentionally inflicted severe emotional distress (IIED) on her.

The trial court sustained demurrers to portions of the first amended complaint (FAC) and the third amended complaint (TAC), allowing no further leave to amend. In connection with filing her notice of appeal, Appellant voluntarily dismissed, without prejudice, an additional cause of action for

---

[1] All further statutory references are to the Business and Professions Code unless noted.

breach of contract against ASMG, based on its alleged violations of a nondisparagement clause in her 2004 separation agreement with ASMG.

Appellant contends on appeal that all of her causes of action are well pled, or could be successfully amended to add any essential allegations to state such causes of action. She argues her statutory claims seek legitimate remedies, including injunctive relief and restitution, and the tort claims for damages are necessary to redress her economic and personal injury.

Having reviewed the pleadings in light of well-established legal principles, we conclude Appellant has not successfully alleged, on the operative facts and theories she has consistently pled, the statutory causes of action under the Cartwright Act or the UCL, nor has she demonstrated any realistic possibility of further amendments. The trial court's analysis of the relevant legal and policy considerations, as applied to those pleaded facts, was correct as a matter of law. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 186–187 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*); *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 195–196 [91 Cal.Rptr.2d 534] (*Freeman*).)

We reach similar conclusions on the demurrer rulings with respect to each of the tort causes of action asserted, with one exception. As against ASMG, the cause of action pled in the TAC for intentional interference with prospective business advantage was not previously subjected to demurrers, and this record requires that Appellant should be allowed an opportunity to amend her pleading to assert the type of wrongful conduct that, under established legal measures, may be able to support a cognizable claim. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*).) Even though, as stated by the Supreme Court in *Korea Supply*, the pleading and proof requirements for pursuing a cause of action for damages for intentional interference with prospective economic advantage are more rigorous in some respects than those of the UCL, we cannot say on this record that Appellant clearly lacks any such recourse in damages against ASMG for the injuries she claims to have suffered as a result of its alleged wrongful acts controverting her economic interests. As to Scripps, however, such claims are not well taken, for reasons to be explained.

Moreover, our examination of the record in light of the applicable pleading standards leads us to conclude that, as against either respondent, Appellant cannot demonstrate how she could state any viable theory of negligent interference with prospective business advantage, nor the "outrageous conduct" required to support a claim of IIED, in this overall factual context of a dispute among professionals in the business of health care. (See *LiMandri v.*

*Judkins* (1997) 52 Cal.App.4th 326, 348–350 [60 Cal.Rptr.2d 539]; *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

The judgment dismissing the action against Scripps is accordingly affirmed. We reverse the judgment of dismissal as to ASMG, with directions to the trial court to conduct appropriate further proceedings to allow Appellant to file an amended pleading against ASMG solely on the claim of intentional interference with economic advantage, as well as allowing her to reassert, if so desired, her voluntarily dismissed breach of contract claim.

I

### BACKGROUND: PARTICIPANTS AND FILING OF ACTION

For purposes of analyzing the demurrer rulings, we take the facts properly pleaded to assess whether they may state their causes of action, as matters of law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) In the original and all her amended complaints, Appellant alleges essentially the following transactional facts (to be expanded as needed in the discussion portion of this opinion). We mainly postpone our summary of the individual rulings on demurrer giving rise to this appeal until the discussion portion of this opinion.

Until 2004, Appellant was a longtime member of ASMG, and she had staff privileges to provide anesthesia services at several institutions, including Scripps and its outpatient facility, Ximed.[2] After overcoming health problems (breast cancer), and learning that the facility where she was currently working was closing, she decided to leave ASMG to pursue her own practice. Upon leaving ASMG in July 2004, Appellant negotiated a separation agreement to resolve their disputes over professional fees she was claiming were due to her, and the agreement included a nondisparagement clause.

After her separation from ASMG employment, Appellant alleges she appropriately communicated to ASMG and Scripps/Ximed doctors and staff that she was not able to or interested in taking on scheduled call duties at Scripps for emergency and other services for nights and weekends, as the ASMG contractual arrangement provided for its affiliates to do. Appellant made it clear to ASMG and Scripps officials that she was unable or unqualified to take such call duty, due to her interest in preserving her health by avoiding such unexpected calls, and because she had not practiced in an

---

[2] Ximed was originally named as a defendant, but was dismissed and is no longer a party.

emergency and trauma care setting for more than 15 years, but instead had specialized in elective plastic surgery for that time.

Upon leaving ASMG in 2004, Appellant retained her privileges at Scripps, although she mainly continued to practice anesthesia in private outpatient surgery centers, working primarily with two plastic surgeons, Dr. Steven Cohen and Dr. Stewart Kincaid (the two surgeons). Appellant also provided anesthesia services to these two surgeons when they performed procedures at other outpatient surgery centers affiliated with other hospitals in the area (a Sharp Metro Hospital facility, and Mercy Outpatient Pavilion (MOPP), at Scripps Mercy Hospital, where she also obtained privileges).

In 2006, the two surgeons with whom Appellant worked started performing procedures at Ximed, utilizing anesthesia services there from Appellant and from ASMG doctors. Ninety-nine percent of the anesthesiologists serving on staff at Scripps are employed by ASMG, and Appellant came to believe ASMG was unlawfully influencing the Scripps medical staff to cooperate in interfering with her efforts to practice there.

Specifically, Appellant alleges that when she decided in 2006 to resume practicing at Scripps, to take cases there with the two surgeons, ASMG and Scripps together allegedly took actions to limit her practice at Scripps/Ximed in several ways, all of which she claims amounted to unfair business practices or were otherwise wrongful. Appellant asserts that ASMG and/or Scripps allegedly made knowing misrepresentations to interested parties that her employment status was "retired," that she did not carry her fair share of call duty, that this adversely affected hospital morale, and that she was disruptive, adversarial, and should be avoided. Scripps officials allegedly told surgeons using its facilities that, according to some unwritten rule or practice, they were not allowed to specifically request her professional services, but instead had to use those anesthesiologists who took scheduled call duty pursuant to ASMG arrangements.

When Appellant obtained privileges at MOPP (with Scripps Mercy), ASMG officials allegedly threatened to withhold ASMG services previously provided there, unless Appellant's privileges were blocked. Also around that time, ASMG notified her that her health insurance policy on its plan had been canceled, although it later claimed this was a mistake, and the policy remained in effect. Appellant, as a cancer survivor, alleges she suffered serious emotional distress while unfairly placed under that misapprehension.

Appellant further alleges that ASMG and Scripps worked together, without justification, to enact new hospital staffing rules that imposed unfair burdens upon her in particular, such as adopting rules that required all staff, including

her, to participate in regular night and weekend hospital call duty. Other such new utilization and staff rules required anesthesiologists practicing at Scripps to attend a minimum number of monthly meetings, and to participate in at least 20 surgical cases over a two-year period. Unilaterally, Scripps reclassified Appellant as having "active" status, rather than "courtesy" privileges, which subjected her to additional administrative requirements for renewal of privileges at Scripps.[3] However, about 50 other similarly situated anesthesiologists were allowed to retain their courtesy status.

In December of 2007, Appellant filed this action and amended her complaint (FAC) in January 2008. Originally, in addition to her unlawful business practices, antitrust and emotional distress claims, Appellant pursued separate causes of action for conspiracy and negligent infliction of emotional distress. Each respondent successfully brought demurrers to certain of these causes of action but not others,[4] and eventually each respondent filed an answer to the SAC.

By stipulation, Appellant filed her TAC, which retained the same four causes of action as in the SAC (except for correctly omitting Scripps from the IIED claim). As against ASMG, Appellant was allowed to add a breach of contract theory, based on alleged violation of the nondisparagement clause in her 2004 separation agreement from ASMG (defamatory remarks calling her "disruptive," "unfair," and "adversarial"). Respondents again demurred and sought judgment on the pleadings.

After extensive briefing and hearing, all demurrers were sustained without leave to amend and judgments of dismissal were entered. Appellant voluntarily dismissed her breach of contract claim against ASMG, without prejudice, to seek this immediate appellate review.

---

[3] The record is not clear as to Appellant's current status as to hospital privileges at Scripps. According to her opening brief (filed in Dec. 2010), Appellant's privileges "technically" expired in March 2008 and February 2010, but she does not know whether her applications have been processed by Scripps.

[4] The trial court sustained the demurrers to the FAC without leave to amend as to Appellant's causes of action for violation of the Cartwright Act, a separate claim of conspiracy, and negligent infliction of emotional distress. At the second amended complaint (SAC) stage, Scripps obtained an order sustaining its demurrer to the claim for IIED without leave to amend (although that claim remained pending as to ASMG). It was not until the TAC was filed that either respondent demurred to the claims for damages for interference with prospective economic advantage.

## II

### STANDARD OF REVIEW AND ISSUES PRESENTED

We apply well-established rules of review. "A demurrer tests the legal sufficiency of the complaint. [Citation.] Therefore, we review the complaint de novo to determine whether it contains sufficient facts to state a cause of action. [Citation.] 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' [Citation.] The trial court exercises its discretion in declining to grant leave to amend. [Citation.] If it is reasonably possible the pleading can be cured by amendment, the trial court abuses its discretion by not granting leave to amend. [Citation.] The plaintiff has the burden of proving the possibility of cure by amendment." (*Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 78 [14 Cal.Rptr.3d 893]; see *Blank v. Kirwan, supra,* 39 Cal.3d 311, 318; *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 327 [70 Cal.Rptr. 849, 444 P.2d 481] (*Chicago Title*), distinguished on another point in *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 781, fn. 18 [111 Cal.Rptr.3d 666, 233 P.3d 1066].)

Although a court must on demurrer accept as true properly pleaded facts, a demurrer does not admit contentions or conclusions of law or fact. (*Chicago Title, supra,* 69 Cal.2d 305, 327.) Particularly as to the Cartwright Act and UCL causes of action, in ruling on these demurrers, the superior court was required to apply statutory standards to the pleaded facts. Determining the meaning of a statutory standard requires the resolution of a question of law. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].) "The soundness of the resolution of such a question is examined de novo." (*Ibid.*) As will be explained, those statutory claims are not well stated on this record, as to either of the Respondents, and we will discuss the problems with Appellant's statutory arguments as to Respondents collectively.

However, a different approach is required as to Appellant's tort theories, in which she has more clearly pled she stands in a different relationship to ASMG than to the Scripps facilities served by ASMG. We address, separately, those interference with economic relations and emotional distress claims against Respondents.

## III

### *ALLEGED VIOLATIONS OF ANTITRUST LAW*

#### A. FAC Hearing and Ruling

In this claim in the FAC, Appellant incorporated her general allegations, and added that Respondents effectively conspired against her in order to limit her services and to bar her from competing with ASMG. She alleged she was targeted, exclusively, by the promulgation of the rules requiring call obligations and utilization requirements, and this was anticompetitive activity, since Scripps represented itself to be an "open staff" facility. She sought injunctive relief to prevent Respondents from enforcing those rules or regulations or from intimidating or interfering with her exercise of her professional skills.

To challenge the FAC's cause of action for violation of the Cartwright Act, the demurrers each argued that Appellant had failed to adequately identify a recognized form of a relevant market, in which their actions had allegedly interfered with business interests. In opposition, Appellant argued that she could add further allegations about how she, as a sole practitioner, and possibly other such persons, were being excluded from the San Diego County hospital market.

At the hearing before the trial court, Appellant represented she could possibly identify other non-ASMG anesthesiologists who could have been precluded from practicing at Scripps. She maintained that Respondents should not be able to require single practitioners to operate their practices in a different way. In the briefs and in later filings regarding the related UCL claim, she argues she could add allegations about injuries occurring in the relevant marketplace, because she has a practice of charging less·per patient than ASMG doctors do. This would arguably support her claim there is indirect injury to patients, who might be able to pay less for their elective, cash basis surgeries, if her practice were unrestrained.

After its hearing, the trial court determined that Appellant had only alleged individualized economic injury at a single outpatient surgery center, the claim could not be successfully amended as described, and the demurrers would be sustained without leave to amend.

#### B. Applicable Legal Principles

Section 16750, subdivision (a) of the Cartwright Act generally allows any person injured in her business or property "by reason of anything forbidden or declared unlawful by this chapter" to bring a private action for

treble damages or injunctive relief. Section 16720, subdivision (a), defines the prohibited kinds of "trusts" (combinations of capital, skill or acts by two or more persons) as including those created for or carrying out unreasonable restrictions in trade or commerce.

The elements of this Cartwright Act claim are " ' "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]" ' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47 [77 Cal.Rptr.2d 709, 960 P.2d 513]; see *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 373 [113 Cal.Rptr.2d 175].) "An antitrust claim must plead the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy. [Citation.] California requires a 'high degree of particularity' in the pleading of Cartwright Act violations [citation], and therefore generalized allegations of antitrust violations are usually insufficient. [Citation.] . . . The absence of factual allegations of specific conduct in furtherance of the conspiracy to eliminate or reduce competition makes the complaint legally insufficient. [Citation.]" (*Freeman, supra,* 77 Cal.App.4th 171, 196, fn. omitted.)

Appellant believes she has adequately pled both horizontal and vertical types of illegal restraint of trade arrangements between Respondents, under the tests applicable to those claims. We first examine these two types of alleged anticompetitive conduct, then turn to the requirements for identification of the marketplace in which competition is allegedly being unreasonably restrained. We can then analyze these allegations for sufficiency.

### 1. Distinctions: Horizontal Restraints and Vertical Restraints

The Cartwright Act prohibits combinations in unreasonable restraint of trade. (*Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 540 [78 Cal.Rptr.2d 133] (*Morrison*).) "Certain restraints which lack redeeming virtue are conclusively presumed to be unreasonable · and illegal," and constitute a per se illegal practice. (*Ibid.*) For example, a horizontal combination (an anticompetitive agreement among competitors who are at the same level of distribution) is ordinarily illegal per se. (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680–1681 [60 Cal.Rptr.2d 195] (*Exxon Corp.*).) Likewise, "market division, and *certain types of group boycotts* are unlawful per se." (*Big Bear Lodging Assn. v. Snow Summit, Inc.* (9th Cir. 1999) 182 F.3d 1096, 1101 (*Big Bear*), italics added & omitted; see *Oltz v. St. Peter's Community Hosp.* (9th Cir. 1988) 861 F.2d 1440, 1445 (*Oltz*).)

Appellant's theory is that she, as a sole practitioner, and possibly other such persons, were being excluded from practice at Scripps, through false

statements made by ASMG and Scripps, and through their conspiracy to implement unjustifiable rules and regulations. She contends that those actions amounted to a "horizontal group boycott," in which "entities at the same level combin[e] to deny a competitor at their level the benefits enjoyed by the members of the group," jointly disadvantaging the competitor. (*Freeman, supra*, 77 Cal.App.4th 171, 196, fn. 26.) Since ASMG competes at the same level as Appellant, she would have us apply per se rules of illegality, because such conduct is "manifestly anticompetitive." (*Oltz, supra*, 861 F.2d at p. 1445.) Appellant thus argues she need not further define the local hospital marketplace in her pleadings, because she is alleging, inter alia, per se violations. "Elaborate market analysis and case-by-case evaluation are unnecessary in cases involving *per se* antitrust violations because the anticompetitive effects of the practice are presumed." (*Big Bear, supra*, 182 F.3d 1096, 1101–1102.)

■ At the pleadings stage, mere conclusory allegations of "manifestly anticompetitive" conduct may be deemed insufficient as a matter of law, "where there exists 'no tenable *per se* boycott theory.' " (*Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1044, 1049 [219 Cal.Rptr. 203] (*Bert G. Gianelli*), disapproved on another point in *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 394 [46 Cal.Rptr.3d 668, 139 P.3d 56].) Appellant only pleads legal conclusions that ASMG, by influencing the other respondent, Scripps, with respect to enactment and application of rules and regulations and professional relations, achieved a substantially adverse effect on her own practice. This does not suffice to support any viable legal theory of a per se type of violation, in the form of "restraints which lack redeeming virtue." (*Morrison, supra*, 66 Cal.App.4th 534, 540.)

■ Scripps, where ASMG doctors work, is not in a horizontal competitive relationship with Appellant, but supplies facilities to practitioners. A "vertical boycott" occurs when "entities at different levels of distribution combine to deny a competitor at one level the benefits enjoyed by the members of the vertical combination." (*Freeman, supra*, 77 Cal.App.4th 171, 196, fn. 26; see *Exxon Corp., supra*, 51 Cal.App.4th 1672, 1680–1681.)

For such allegations against both Respondents, the rule of reason test applies, to determine " 'whether particular concerted conduct unreasonably restrains competition.' " (*Big Bear, supra*, 182 F.3d 1096, 1101; see *Freeman, supra*, 77 Cal.App.4th 171, 194.) To examine if Respondents' alleged anticompetitive actions had any basis in reason, we next consider the extent to which Appellant can adequately plead the existence of the relevant market, as

a means of demonstrating how the alleged unlawful conduct had evident adverse effects upon competition within that market. (*Big Bear, supra,* at p. 1101.)

## 2. *Vertical Restraint Test: Antitrust Market and Injury*

■ It is well accepted that "the ' "antitrust laws . . . were enacted for 'the protection of competition, not competitors.' " ' [Citation.] They 'do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws.' [Citation.] Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws." (*Cel-Tech, supra,* 20 Cal.4th 163, 186, italics omitted.)

■ A complaint must allege "facts from which injury to market-wide competition can be inferred." (*Korshin v. Benedictine Hosp.* (N.D.N.Y. 1999) 34 F.Supp.2d 133, 138 (*Korshin*).) " 'An "antitrust injury" must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful. [Citations.]' " (*Morrison, supra,* 66 Cal.App.4th 534, 548, quoting *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 723 [187 Cal.Rptr. 797].)

■ In *Exxon Corp., supra,* 51 Cal.App.4th 1672, the court explained that where an antitrust plaintiff alleges vertical restraints, facts must be pled showing "some anticompetitive effect in the larger, interbrand market." (*Id.* at p. 1681, citing *Bert G. Gianelli, supra,* 172 Cal.App.3d at pp. 1044, 1048.) "[T]he prevailing standard [is] the 'rule-of-reason' which measures whether the anticompetitive aspect of a vertical restraint outweighs its procompetitive effects. [Citation.] And it is plaintiff's burden to make the required showing of a ' "substantially adverse effect on competition in the relevant market." ' [Citation.]" (*Exxon, supra,* at p. 1681.)

Injury to an individual plaintiff is insufficient to establish standing to assert antitrust violations. (*Korshin, supra,* 34 F.Supp.2d 133, 139–140.) In the medical field, sufficient, successful allegations of antitrust injury might include negative impacts upon overall prices, quantity or quality of medical services, resulting from the plaintiff's absence as an available provider at the facility. (*Ibid.*) On the face of the pleadings, the nature of this dispute, in the context of highly specialized and regulated medical practice, implicates such public policy concerns regarding prices, and the quantity or quality of medical services. We accordingly inquire into the precise harm allegedly caused by the actions complained of, and whether there is any business excuse for the alleged acts. (*Bert G. Gianelli, supra,* 172 Cal.App.3d at p. 1044.)

### 3. *Relevant Public Policies*

To support her claims of unfair competition, Appellant mainly relies on *Oltz*, in which the court used the rule of reason test and accepted the plaintiff's argument that a hospital's exclusive arrangement to utilize medical doctor anesthesiologists, rather than a nurse-anesthetist like the plaintiff, "potentially affected two different segments of the economy. One segment was the market in which anesthesia service providers compete for staff privileges at hospitals; the other was the patient market for anesthesia services. Consideration of the impact of the exclusive contract on competition does not require acceptance of one segment as the relevant market and rejection of the other. Rather . . . a showing of injury to competition in either market suffices for the rule of reason." (*Oltz, supra*, 861 F.2d 1440, 1447.)

■ In *Oltz*, these guidelines for analyzing the relevant marketplace are set forth: "Defining the market is not the aim of antitrust law; it merely aids the search for competitive injury. Once defined, the relevant market demarcates 'objective benchmarks' for separating reasonable and unreasonable restraints. [Citation.] It requires the claimant to demonstrate harm to the economy beyond the claimants' own injury. [Citation.] In so doing, market definition furthers antitrust policy: the protection of competitive processes and not individual competitors." (*Oltz, supra*, 861 F.2d 1440, 1448.)

In *Oltz, supra*, 861 F.2d 1440, 1447, the relevant market was two hospitals in the greater Helena, Montana area, where there were essentially no other opportunities for the plaintiff nurse-anesthetist to practice his profession. On appeal, the court determined that the interests of the two sets of defendants (the hospitals and the medical doctors who had tried to keep the plaintiff from practicing there) were sufficiently independent so that their collaborated conduct was arguably harmful to competition, and was not protected by the rule of reason. (*Ibid.*)

■ In *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Assn.* (7th Cir. 1994) 36 F.3d 664, 667 (*BCB Anesthesia Care*), the court analyzed antitrust claims involving "one hospital's decisions about staff privileges and staffing patterns," in light of other authorities challenging hospital decisions about medical staffing. There, the court stated: "Those cases invariably analyze those circumstances under the rule of reason—there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all. [Citation.] A hospital has an unquestioned right to exercise some control over the identity and number to whom it accords staff privileges. [Citation.] Malpractice concerns, quality of care, market perceptions, cost, and administrative considerations may all impact those decisions." (*Ibid.*)

In its analysis, the court deciding *BCB Anesthesia Care, supra,* 36 F.3d 664, 668, took note that *Oltz, supra,* 861 F.2d 1440, stood alone as the only important antitrust medical staffing case in which the plaintiff had prevailed, to date. The court explained that in *Oltz,* "the court was apparently persuaded by the determination that the relevant market, while not one hospital, was only two hospitals." (*BCB Anesthesia Care, supra,* at p. 668.) Generally, however, antitrust challenges to a staffing decision at a single hospital do not succeed, because such cases normally do not present any "facts indicating special circumstances raising antitrust concerns." (*Ibid.*) The reasons for such a lack of success in pursuing an antitrust claim may include, as relevant here, a "lack of antitrust injury, failure to show a detrimental effect on competition, [or] insufficient market power in the relevant market." (*Ibid.*)

*Oltz, supra,* 861 F.2d 1440, is still good authority, on its own facts. It has not been extensively cited or followed. The Ninth Circuit Court of Appeals discussed and distinguished it on an evidentiary point in *County of Tuolumne v. Sonora Community Hosp.* (9th Cir. 2001) 236 F.3d 1148 (*County of Tuolumne*). Specifically, *Oltz* was described there as an example of successful antitrust allegations by a health care provider-plaintiff, who had supplied direct evidence supporting his theory of a conspiracy to engage in anticompetitive conduct against him, carried out by a hospital and a group of anesthesiologists. (*Id.* at pp. 1155–1156.) In *Oltz* there was direct evidence about the ongoing feud between the plaintiff-nurse anesthesiologist, and a group of physician-anesthesiologists, and the defendant hospital governing board's meeting minutes directly showed knowledge that this feud might cause deterioration of the quality of care there, leading the board to take anticompetitive action to appease the group of physician-anesthesiologists. (*Ibid.*)

In *County of Tuolumne, supra,* 236 F.3d 1148, 1155–1156, the court did not find the required supporting direct evidence of conspiracy to prevent the physician-plaintiff from practicing at the subject hospital, as he alleged. We need not describe the distinguishable factual context of that dispute, but instead refer to its use of the legal test to be applied when circumstantial evidence of conspiracy is presented by such an antitrust plaintiff. The defendant can rebut such allegations of conspiracy " 'by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.' " (*Id.* at p. 1156.)

In *County of Tuolumne, supra,* 236 F.3d at pages 1155 through 1156, the hospital that was accused of conspiring with other physicians to harm the plaintiff, through anticompetitive conduct, made an adequate showing of its "plausible and justifiable reason" for establishing certain criteria for allowing doctors to practice there, under the applicable public policies: "The setting of

privileging criteria by a hospital is consistent with providing quality patient care and keeping insurance costs manageable." (*Ibid.*) There, the physician-plaintiff who had objected to the application of those criteria had failed to carry the burden to show that the defendants' actions were outside the scope of " 'permissible competitive behavior,' " or to show they were conspiracy related. (*Ibid.*)

In applying the rule of reason in such cases, the courts have drawn distinctions " 'between the intentional actions of a hospital directed specifically toward the exclusion of a particular physician or groups of physicians, and the actions of a hospital which may, as a practical matter, result in the exclusion of individual practitioners but were undertaken for less personally directed reasons.' " (*Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1183–1184 [270 Cal.Rptr. 894] (*Mateo-Woodburn*), quoting *Redding v. St. Francis Medical Center* (1989) 208 Cal.App.3d 98, 104 [255 Cal.Rptr. 806] (*Redding*).) Even where a structural staffing change may result in the exclusion of certain doctors from practice, "[i]f the justification is sufficient, the doctor's vested rights must give way to public and patient interest in improving the quality of medical services." (*Mateo-Woodburn, supra,* at p. 1185.)

Such cases illustrate that judicial deference is paid to managerial decisions concerning operation of a hospital, where the decisions appear to have been made rationally and in good faith by the hospital authorities. Hospitals have special expertise in promoting quality of care and in making workable administrative arrangements. (*Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1185.) " ' "Judges are untrained and courts ill-equipped for hospital administration, and it is neither possible nor desirable for the courts to act as supervening boards of directors for every . . . hospital . . . in the state." [Citations.]' " (*Ibid.*)

 Even vertical restrictions may legitimately be allowed to reduce some forms of competition, if they also promote other forms of competition by allowing service providers " 'to achieve certain efficiencies in the distribution of its products [citation],' " under the rule of reason standard. (*Bert G. Gianelli, supra,* 172 Cal.App.3d 1020, 1045, fn. 7.)

Normally, "[a] staffing decision does not itself constitute an antitrust injury." (*BCB Anesthesia Care, supra,* 36 F.3d 664, 669.) Unless the effect of the conduct of a single health care provider is to deny patients reasonable access to any health care, the marketplace is not significantly affected by such individualized conduct. " 'If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from becoming so trivialized, the

reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.' [Citation.]" (*Ibid.*)

It is not enough to allege as antitrust injury, in a hospital context, "that plaintiffs cannot now practice in the business form they prefer and the prices the hospital charges may be somewhat higher now than they were." (*BCB Anesthesia Care, supra,* 36 F.3d 664, 668.) Before a court will interfere with how one hospital staffs its physician needs, a strong showing would be required that the purpose and effect of the anticompetitive conduct, within the relevant market defined by the plaintiffs, was outside of reasonable professional standards. (*Id.* at pp. 668–669.)

### 4. *Analysis*

On this set of allegations, the identification of the relevant market should be treated as a matter of law, and Appellant has not shown injury across the relevant market. (*Exxon Corp., supra,* 51 Cal.App.4th 1672, 1682.) Even though Appellant alleges different kinds of techniques were used to single her out and to impede her ability to carry on her profession, she still alleges that only she or possibly other unnamed single practitioners were or might have been affected.

The case before us is more like *County of Tuolumne, supra,* 236 F.3d 1148, than it is like *Oltz, supra,* 861 F.2d 1440, because these Respondents have put forth some legitimate policy explanations for the alleged anticompetitive conduct, and the record does not support Appellant's characterization of Respondents' only rationales for their actions (e.g., appeasement of other competitors). Instead, as in *Korshin, supra,* 34 F.Supp.2d 133, 139–140, the pleading fails to sufficiently allege damage to the relevant marketplace, such as: "any change in the price of anesthesiology services, a decrease in quality or efficiency of care, or that the consumers of anesthesiology services . . . have less of a market choice, other than their ability to select [the plaintiff], as a result of defendants' actions. [Citations.] . . . 'Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted.' " (*Ibid.*)

Moreover, the circumstances described in the pleadings show that Appellant has been able to retain privileges to practice at other outpatient facilities, such as MOPP. Such allegations do not support her claim she has been wholly excluded from practice in the relevant market area (since it is undisputed that San Diego, unlike Helena, Montana in the *Oltz* case (*Oltz, supra,* 861 F.2d 1440), has a number of hospital facilities within the immediate area). (See also *Korshin, supra,* 34 F.Supp.2d 133, 140 [antitrust injury not shown because the plaintiff was not precluded from practicing at

other hospitals, and patients were not foreclosed from going to hospitals at which he could obtain privileges, etc.]; see *BCB Anesthesia Care, supra,* 36 F.3d 664, 668 ["Nothing in the complaint suggests that patients are foreclosed from going elsewhere in the unlikely event that they are involved in pricing decisions [and the plaintiff was not] disabled from practicing [elsewhere]."].)

Appellant did not allege, nor did her proposed amendments add, the kind of "facts indicating special circumstances raising antitrust concerns," with respect to any detrimental effect on competition that caused injury, in excess of her own personal business concerns and circumstances. (*BCB Anesthesia Care, supra,* 36 F.3d 664, 668.) The implementation of the rules and policies of which she complains did not clearly create any adverse effect upon consumer choice in the relevant market. For all of the above reasons, the trial court did not err or abuse its discretion in sustaining the demurrers to this cause of action without leave to amend.

IV

*UCL*

A. Trial Court Ruling: TAC

With respect to the UCL claim, each respondent argued on demurrer that such causes of action require an underlying or predicate "independently wrongful" act, but Appellant had failed to assert a cognizable claim in that respect. (§ 17000 et seq.; the Unfair Practices Act.) Rather, the allegations were the same as in the other previous versions of the complaint, and still reflected conduct arguably within the scope of administration of the respective professions, that should not be properly subject to injunctive relief or recovery of restitution, which were said to be inappropriate remedies against the alleged practices. (§ 17203.)

As proposed amendments, Appellant's opposition to the demurrers sought to add allegations that Respondents' acts caused competitive injury, because if Appellant were allowed to continue to provide services at Scripps, she would charge less than ASMG doctors. The reason is that the procedures she would work on would be typically "cash" procedures that are not covered by insurance, in which the patients pay the surgeon directly. Those surgeons have to pay ASMG doctors more, thus costing the patient more.

In sustaining the demurrers to this claim in the TAC without leave to amend, the trial court first clarified that Appellant was not alleging any unlawful or fraudulent business acts, but instead "unfair" business practices.

The court relied on the definitions in *Cel-Tech, supra*, 20 Cal.4th 163, for determining when such a claim of unfairness to competitors under section 17200 is actionable: When it is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [it] otherwise significantly threatens or harms competition." (*Cel-Tech, supra*, at pp. 186–187.)

The trial court then concluded the TAC did not successfully allege unfairness, in the form of "facts which violate antitrust law, are tethered to some legislatively declared policy, or establish proof of some actual or threatened impact on competition. (*Cel-Tech, supra*, 20 Cal.4th at pp. 186–187.) Instead, Plaintiff alleges only individualized harm which does not support a claim for violation of the UCL. [Citation.] While Plaintiff concludes Defendants' conduct is anticompetitive activity which harms consumers, she fails to assert sufficient facts to support an 'unfair' business act."

### B. Legal Principles and Analysis

 In support of her unfairness argument, Appellant refers to this cause of action as being founded in the Unfair Practices Act (§ 17000 et seq.), but the briefing substantively discusses the related enforcement provisions for that chapter, the UCL, section 17200. "The purpose of the Unfair Practices Act is 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.' (§ 17001.) It prohibits specific 'practices which the legislature has determined constitute unfair trade practices.' [Citation.]" (*Cel-Tech, supra*, 20 Cal.4th 163, 179.)

Here, it is not disputed that Appellant seeks relief under the rubric of the UCL for anticompetitive actions that allegedly harmed her, including the Unfair Practices Act, the Cartwright Act theory, or tort theories, as the "borrowed" substantive law prohibiting unfair business practices. She does not specify which portions of the Unfair Practices Act were allegedly violated.

In *Redding, supra*, 208 Cal.App.3d 98, 107, the court found allegations of unfair business practices were insufficient, regarding a hospital's decision to enter into an exclusive contract with one particular surgeon, because the plaintiffs could not establish such an arrangement was "undertaken for anti-competitive purposes," and moreover, the defendant hospital was not " 'in competition' " with the plaintiffs (other qualified surgeons). (*Ibid.*)

In analyzing Appellant's Cartwright Act claims above, we have not found adequate support for her pleaded claims of unfair business conduct, in the form of certain threatened incipient violations of antitrust laws, or their "policy or spirit," or other acts significantly threatening or harming competition in the medical field as a whole. (*Cel-Tech, supra*, 20 Cal.4th at p. 187.) As already discussed, courts are traditionally reluctant to specify how hospital contracting and staffing policies may be applied to individual practitioners. (*Mateo-Woodburn, supra*, 221 Cal.App.3d 1169, 1184–1185.) Appellant's proposed amendments, claiming patients are ultimately harmed by anticompetitive conduct because her fees would be lower, appear to be speculative in nature and do not address specific " 'practices which the legislature has determined constitute unfair trade practices.' " (*Cel-Tech, supra*, at p. 179.)

Nor do Appellant's alternative tort theories provide an underlying body of law to plead unfair "practices" in this context, where they affected her specifically. Actions under the UCL are not meant to be substitutes for tort or contract actions. (*Korea Supply, supra*, 29 Cal.4th 1134, 1150.) "Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. As we have said, the 'overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition.' [Citation.]" (*Ibid.*)

Without more extensive or clear allegations of how these administrative decisions amounted to " 'anti-competitive business practices' " that injure consumers, Appellant cannot state a claim for necessary " 'preservation of fair business competition.' " (*Cel-Tech, supra*, 20 Cal.4th 163, 179–180.) The individualized relief she seeks, injunctions against the ongoing use of the hospital rules and policies of which she complains, or restitution of lost income, are not appropriate recovery or civil penalties under the UCL. (§ 17206.) Such relief could undermine legitimate public policy concerns and would be inconsistent with judicial recognition of special expertise in the field of hospital administration. (*Redding, supra*, 208 Cal.App.3d at p. 107.)

In any case, as we next discuss, other relief in damages may conceivably be available. "While plaintiff may not recover monetary relief under the limited remedies provided by the UCL, plaintiff may pursue a cause of action under traditional tort law." (*Korea Supply Co., supra*, 29 Cal.4th 1134, 1152.) We next inquire into the viability of such claims.

V

*INTENTIONAL INTERFERENCE WITH PROSPECTIVE*
*BUSINESS ADVANTAGE (TAC)*

A. Argument and Rulings

In demurring to the TAC, Respondents for the first time argued there were defects in the causes of action for intentional and negligent interference with prospective business advantage (i.e., lack of supporting allegations of underlying wrongful acts or duty). Appellant pointed out at the trial court hearing that until this set of demurrers, she had been unaware that Respondents would be attacking them, and she could add more allegations to support her interference claims, about defamatory comments and misrepresentations.

At the hearing, the superior court discussed all the claims in detail, observing at one point that there might be a qualified privilege applicable under Civil Code section 47. However, that statutory analysis does not appear in the written order, nor is it significantly relied on in the briefing, and it is not before us.

The main focus before the trial court was whether Appellant had successfully pleaded the type of underlying wrongful conduct by Respondents (either intentional or negligent), under some established legal measure, that would justify a finding that such interference went beyond normally tolerated business competition. Appellant asserted to the trial court that ASMG personnel had falsely told at least one prospective patient and a surgeon who inquired about her availability that she was retired. Appellant stated that ASMG had made defamatory and disparaging comments to the two surgeons that she wished to work with, and to others, that her conduct and character were bad, such that defamation was a separate wrongful, intentional act in support of this claim of interference with her economic expectancies. At that time, she was still pursuing her breach of contract claim, that ASMG had breached the nondisparagement clause in their separation agreement.

In the rulings, the trial court found it was inadequate for Appellant to allege that Respondents' motives were improper: "[A]n act is not independently wrongful merely because defendant acted with an improper motive. [Citation.] An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard. [Citation.]"

Next, the court disagreed with Appellant that her allegations were sufficient, that "ASMG created and enforced an unwritten policy at Scripps that

surgeons were prohibited from requesting a specific anesthesiologist. [Citation.] [Appellant] complains about the effect of this unwritten policy on her, but does not explain how it is wrongful or even that it is unwise. She complains about new departmental rules requiring attendance at meetings, minimum numbers of procedures, and taking on call duty. [Citation.] [She] prefers not take call, attend meetings, or obtain the necessary training to take call. These are all personal choices, to apparently diminish the stress in her life, but this conduct does not inflate the policies, or other conduct alleged, to an independent wrongful act." The court ruled that her proposed additional allegations of defamation or disparagement did not sink to the level of independently wrongful conduct, apart from any unfair trade practices claims. The court found these tort claims were unfounded under her situation as described. The respective demurrers to the TAC were sustained without leave to amend (mooting the motions for judgment on the pleadings).

### B. Governing Legal Principles

At this stage of the proceedings, we analyze Appellant's allegations only as they are pleaded in her complaints, and "express no view as to whether plaintiff's proof will be sufficient to establish these elements at trial." (*Korea Supply, supra*, 29 Cal.4th 1134, 1164, fn. 14.) It is not dispositive that Respondents did not bring demurrers to attack these particular claims earlier, since we are examining their legal validity as matters of law. However, we also must consider whether Appellant presented enough supporting allegations to the trial court to justify an exercise of its discretion in allowing her leave to amend.

▆▆▆ "We first articulated the elements of the tort of intentional interference with prospective economic advantage in *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865] (*Buckaloo*). These elements are usually stated as follows: ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' " (*Korea Supply, supra*, 29 Cal.4th 1134, 1153.)

In *Korea Supply, supra*, 29 Cal.4th 1134, the court clarified that the third element of the tort of interference with prospective economic advantage "also requires a plaintiff to plead intentional wrongful acts on the part of the defendant designed to disrupt the relationship." (*Id.* at p. 1154, italics omitted.) Whether an act is independently wrongful depends on its unlawfulness (if it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"). (*Id.* at p. 1159.)

In *Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 618–619 [17 Cal.Rptr.2d 708], the plaintiff retail businessman (beauty supply store) alleged that the defendant and respondent company had breached a contract to keep supplying certain products to him. It mainly supplied products to hair salons, not retailers. He additionally sought to plead the tort of intentional interference with prospective business advantage, but the court found those allegations were defective, because there was no factual basis for the assertion that the defendant company had tortiously interfered with the retailer's existing commercial contacts, for any improper purpose. Rather, the company had made a business supply decision, and its effect on customers and any damage to business "were simply consequences of breach of contract." (*Id.* at p. 618.) In finding the pleading of interference with prospective advantage to be defective, the court referred to "the cautious policy of the courts about extending tort remedies to ordinary commercial contracts." (*Ibid.*) The court found no abuse of discretion had occurred when leave to amend was denied, because the trial court had not incorrectly applied the standard for determining " 'whether behind the words of the pleading anything of legal substance lies, whether on further revision the pleading can honestly state a cause of action.' " (*Ibid.*)

## C. Analysis: ASMG

In analyzing this theory, we are mindful that the TAC also contained a cause of action for breach of contract against ASMG, alleging that it had disparaged and defamed Appellant, contrary to its previous promises not to do so in her agreement regarding separation from employment with them. We think it is appropriate to read the allegations of this contract cause of action (dismissed without prejudice pending appeal) together with the current claims of intentional interference with economic advantage, although they were pled separately. Those alleged acts of defamation or disparagement could legitimately be considered to meet, for pleadings purposes, the standards for establishing "independent wrongfulness" of interference, as enunciated in *Korea Supply, supra*, 29 Cal.4th 1134, 1159, if properly incorporated into the TAC cause of action. Common law defamation claims are subject to "determinable legal standard[s]" for resolution, as required for such a tort claim. (*Ibid.*) Even though we have not found the Cartwright Act and UCL causes of action to be well pled, there are apparently other allegations of wrongful conduct by ASMG, potentially supporting the current cause of action to claim injury through ASMG's intentional interference with economic advantage.

As to ASMG, we conclude Appellant has sufficiently alleged the first of the required elements, existence of a previous economic relationship with the two surgeons, with probability of future economic benefit to her. Next, Appellant adequately alleged that ASMG had knowledge of this ongoing economic

relationship with the two surgeons, and that the relationship would have probable future economic benefit to her, but ASMG nevertheless engaged in certain "intentional wrongful acts" designed to disrupt her professional relationships. (*Korea Supply, supra*, 29 Cal.4th at p. 1154, italics omitted.) For example, ASMG officials allegedly threatened to withhold ASMG services previously provided at MOPP, unless Appellant's privileges there were blocked. They are also said to have defamed or disparaged her character and ability to perform adequately, and they told their members to avoid her.

Alternatively, Appellant claims that if specific intent was lacking, such ASMG acts were performed at least with knowledge that some adverse interference was certain or substantially certain to occur as a result. In some ways, Appellant is claiming that she has a right to carry on her practice in her own business model of a sole practitioner, different from the group practice of her competitor, ASMG. We can express no opinion about the validity of the respective business models, and only observe that the alleged anticompetitive measures had some probability of impeding Appellant's existing practice and business expectancies. ASMG demonstrated that there were some legitimate professional reasons for its own form of practice, and for the Scripps rules and regulations on practice. However, for pleadings purposes, we assume the truth of the allegations that these were imposed without adequate justification and specifically against her interests. As noted, issues of privilege under Civil Code section 47, discussed with the trial court, have not been fully briefed or litigated, and we express no opinion on them.

Accordingly, we cannot currently determine that Appellant will be unable to adequately allege proximate causation of economic harm to her from wrongful acts of ASMG. The disruption in her practice that she attributes to its acts may well have been caused by other factors, but it is not yet before the courts whether there is a causal relationship between ASMG's allegedly wrongful acts and Appellant's harm. We therefore conclude she may be able to assert alleged facts that satisfy the proximate cause element of this tort. (*Korea Supply, supra*, 29 Cal.4th 1134, 1164–1166.)

Finally, Appellant represented to the trial court and states in her briefs that she can add more allegations about the type of wrongful conduct or malice that would further support her claims, such as misrepresentations of hospital rules, representations to prospective patients or other surgeons that she had retired, and disparaging comments about her character and abilities, as more fully alleged in the breach of contract claim. These may add to the viability of the current cause of action, and the trial court should have allowed Appellant an opportunity to file an amended pleading to state her best case on this theory, in addition to reasserting her breach of contract claim, if desired, and we will reverse the judgment of dismissal as to ASMG with directions to that effect.

## D. Analysis: Scripps

In the ruling, the trial court did not materially distinguish between the conduct alleged against Scripps and ASMG. This was understandable, in light of the conspiracy allegations Appellant consistently made to tie them together. However, it is difficult to find among the allegations against Scripps, even considering such conspiracy language, the type of independently wrongful conduct that would support this claim.

Specifically, Appellant claims that Scripps engaged in intentionally wrongful acts designed to disrupt her economic relationship with the two surgeons with whom she had consistently worked. She claims Scripps falsely told at least one surgeon and one patient she had retired, and that Scripps officials imposed call, utilization, and meeting requirements in a way that operated to target her in a wrongful fashion. However, those allegations are undermined by her admissions that she previously held Scripps privileges, was in the process of renewing them, and had not yet been turned down. Although she claims that she was unilaterally reclassified from courtesy to active status, and had difficulty meeting those requirements, it is not clear how those changes in her professional status would impede her efforts to continue to work with the two doctors, who also practiced at several other locations. She does not support her allegations that it was the Scripps officials who expressly sought to interfere with her existing professional relationships, or that Scripps knew or should have had knowledge that its actions would certainly or substantially certainly cause interference with her prospective advantage.

The gist of Appellant's allegations of interference with economic advantage is clearly directed toward the ASMG activities, and Scripps (not a direct competitor), appears as a more or less peripheral actor. The regulatory activities by Scripps, as alleged, seem to fall within the sphere of lawful administrative behavior, rather than any tortious interference or predatory economic behavior. (*Korea Supply, supra,* 29 Cal.4th 1134, 1159–1160.) There is no basis to reverse the judgment of dismissal as to Scripps as to this claim.

### VI–VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment is affirmed as to Scripps.

---

*See footnote, *ante,* page 480.

Judgment is reversed as to ASMG with directions to the trial court to allow further proceedings to enable Appellant to file an amended complaint versus ASMG only, if desired, to plead a theory of intentional interference with prospective economic advantage, and/or to reassert her breach of contract claim.

Scripps is to receive its costs on appeal. Appellant and ASMG shall both bear their own costs.

McDonald, J., and O'Rourke, J., concurred.